

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: January 06, 2020.**

_____
**CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50274-cag |
| | § | |
| ABDELALI SAAID, | § | |
|     Debtor. | § | CHAPTER 7 |
| | § | |
| | § | |
| USED CARS, INC., | § | |
|     Plaintiff | § | |
| v. | § | ADVERSARY NO. 19-05021-cag |
| | § | |
| ABDELALI SAAID, | § | |
|     Defendant. | § | |

### MEMORANDUM OPINION ON PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Came on to be considered on December 2, 2019, the trial on the merits on Used Cars, Inc.'s ("Plaintiff" or "Used Cars") Complaint to Determine Dischargeability of Debt. (ECF No. 1)[1] ("Complaint"). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is referred to this Court under the District's Standing Order on

---

[1] "ECF" refers to the electronic case file docket number.

Reference. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2)(I) (determination of the dischargeability of debts). Venue is proper in the Western District of Texas under 28 U.S.C. § 1409. The following is the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052(a).[2] Used Cars filed its Amended Statement Regarding Consent (ECF No. 7) which consents to the entry of final orders and a final judgment by this Court. Abdelali Saaid consents to the entry of final orders and a final judgment by this Court and filed his Statement Regarding Consent (ECF No. 8).

## PARTIES' CONTENTIONS

Used Cars contends Abdelali Saaid ("Saaid" or "Defendant") obtained money, services, or an extension, renewal, or refinancing of credit from Used Cars by false representations or alternatively by actual fraud, and, therefore the debt owed to Used Cars by Saaid is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Used Cars also contends Saaid's acts caused willful and malicious injury to Used Cars and therefore, the debt owed to Used Cars by Saaid is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(6).[3] Saaid disputes Plaintiff's contentions, *inter alia*, asserting that he was not responsible for the operations of Best Drive Auto, Inc. dba Best Drive Auto ("Best Drive"). Saaid asserts the affirmative defenses of estoppel, waiver, and failure to mitigate damages.

## STIPULATIONS OF FACT PURSUANT TO JOINT PRE-TRIAL ORDER

Pursuant to the Joint Pre-Trial Order (ECF No. 12), Used Cars and Saaid agreed to the following facts:

---

[2] Hereinafter, the Federal Rules of Bankruptcy Procedure shall be referred to as the "Bankruptcy Rule(s)" unless otherwise noted.
[3] Plaintiff also asserted a cause of action under 11 U.S.C. § 523(a)(4) but orally withdrew that count at trial.

On or about September 9, 2018, Saaid filed his petition for relief under Chapter 7 of the Bankruptcy Code, Bankruptcy No. 19-50274-cag, before this Court. An Order Discharging Debtor was entered on May 16, 2019, and Saaid's bankruptcy case was closed on September 25, 2019. On May 10, 2019, Used Cars filed its Complaint. Service was proper upon all necessary parties to the Complaint. The Complaint was filed to obtain a determination of the dischargeability of a debt pursuant to Bankruptcy Rules 4007 and 7001(6).

Used Cars is a lender involved in floor plan financing for borrowers to purchase and sell used vehicles. Saaid was the 100% owner and president of Best Drive who was a borrower of Used Cars and a seller of used vehicles, hereinafter referred to as "units."

Saaid began his business relationship with Used Cars on April 3, 2017. Saaid executed a loan agreement with Used Cars for a line of credit that Best Drive used for the purchase of vehicles to sell to its customers. Plaintiff ("Pl.") Exhibit ("Ex.") 1, page 1. Also on April 3, 2017, as part of the loan agreement, Saaid executed a promissory note in the original amount of $500,000.00 in favor of and made payable to Used Cars. Pl. Ex. 1, p. 14. Further, on that same date, Saaid executed a security agreement in favor of Used Cars whereby used vehicles purchased by Best Drive were pledged as collateral to secure the repayment and performance of obligation under the promissory note. Pl. Ex. 1, p. 17. Furthermore, on the same date, Saaid executed a Floor Plan Agreement in favor of Used Cars. Pl. Ex. 1, p. 27. Saaid executed all of the loan documents as president of Best Drive and in his individual capacity.

The loan documents were renewed on or about March 26, 2018, when Saaid executed a loan agreement ("March 2018 Loan Agreement") with Used Cars for a line of credit that Best Drive used for the purchase of vehicles to sell to its customers. Pl. Ex. 1, p. 31. As part of the March 2018 Loan Agreement, Saaid also executed a promissory note in the original principal

3

amount of $650,000.00 in favor of and made payable to Used Cars. Pl. Ex. 1, p. 45. On the same date, Saaid executed a Floor Plan Agreement with Used Cars. Pl. Ex. 1, p. 49. Further, Saaid executed a security agreement in favor of Used Cars whereby the used vehicles purchased by Best Drive were pledged as collateral to secure the repayment and performance of Best Drive's obligations under the note. Pl. Ex. 1, p. 53. Used Cars perfected its lien under the security agreement by filing a UCC-1 Financing Statement in the Office of the Texas Secretary of State and taking possession of vehicle titles. Pl. Ex. 1, p. 63.

The floor plan agreements authorized Best Drive to purchase specific units with advances from Used Cars after presenting a written request for funding to Used Cars and obtaining its consent. Upon purchase of the specific units with the advanced funds, Best Drive was required to forward the original titles to Used Cars. Used Cars retained the vehicle titles until it received notification from Best Drive that a specific unit was sold to a customer. Used Cars would then send the original title corresponding to the unit back to Best Drive. Payments from the sales of the specified units were sent from Best Drive to Used Cars the day after such sale. The parties agree that Saaid owes Used Cars sales proceeds for sixty-five units based on his and Best Drive's obligations under the loan documents.

Four witnesses testified at trial. Teresa Wolfe ("Wolfe") and Jeffrey Brymer ("Brymer"), both employees of the Plaintiff, testified. Wail Suleiman ("Suleiman"), an employee of Best Drive, and Defendant testified. The Court found Wolfe's and Brymer's testimonies credible. As explained herein, Saaid's and Suleiman's testimonies directly contradicted each other. Either Saaid or Suleiman was lying, because each disputed the other's role regarding management of Best Drive and who was responsible for selling vehicles out of trust and not remitting the sale proceeds to Plaintiff.

## **FINDINGS OF FACT**

Teresa Wolfe

Wolfe is the vice-president of Used Cars and performs record and book keeping tasks. She has been an employee of Used Cars for thirty-one years. Wolfe explained the relationship between Plaintiff and Best Drive. Plaintiff would provide floor financing for Best Drive to purchase vehicles. As the vehicles were sold, Plaintiff would provide the certificates of title to Best Drive. Best Drive would then remit to Used Cars the sale proceeds for each unit sold. Wolfe explained that Used Cars has a security interest in Best Drive's car inventory, certificates of title, records, balance on deposit account, insurance proceeds, and products. Pl. Ex. 1 at p. 53.

Wolfe explained that sixty-five units had been sold of out "trust," meaning that the cars were sold to customers, but the titles were either in the possession of the Texas Department of Motor Vehicles ("DMV") or Plaintiff. Pl. Ex. 2. Further, Wolfe stated that Used Cars received a letter from the DMV requesting the titles for vehicles sold out of trust so that the titles could be remitted to the purchasers of the units. Pl. Ex. 3, p.35. As a result, the DMV investigated what happened to the vehicles. Thereafter, several of the titles were turned over to the DMV. Pl. Ex. 3.

Additionally, Wolfe stated that a number of sales of units resulted in insufficient funds being returned to Plaintiff's bank as a result of Plaintiff drawing on Best Drive's bank account for collection on the floor financing for the sale of units. Wolfe testified that Used Car initiated out-for-collection notices to Best Drive for the titles of vehicles that were sold where repayment on the floor financing did not occur. Wolfe then testified as to the meaning and relevance of Plaintiff's Ex. 4 (copies of the original certificates of title); Plaintiff's Ex. 5 (copies of deal jackets reflecting sales with buyers); and Plaintiff's Ex. 6 ("white slips" - title application receipts that should contain the original titles). Plaintiff's Ex. 4–6 demonstrate that when vehicles are sold, fees and taxes are

deducted and the proceeds of sale that were to be remitted to Plaintiff. Instead, Plaintiff's Ex. 4–6 show that no white slips or titles were remitted to Plaintiff after a unit was sold. Also, Plaintiff's Ex. 7 contains deal jackets with white slips and titles that indicate that payment was out for collection. Plaintiff's Ex. 7 also shows that titles were sent to Best Drive because vehicles had been sold, but no sale proceeds were remitted to Plaintiff. Wolfe testified as to the deal jackets for several units as representative of what had occurred for units sold out of trust.[4] The transactions were all the same with the result being that after each unit that was sold, Best Drive did not remit the sale proceeds to Used Cars. Further, all the transactions in Plaintiff's Ex. 7 pre-date May 2018.

Jeffrey Brymer

Brymer has been the owner and president of Used Cars since 2014. Brymer stated that he interacts with customers daily and that his focus is dealing with dealerships that are in default. Brymer stated that he became more involved with Best Drive in April 2018 when he froze the Best Drive letter of credit. Brymer stated that he had met with Saaid and Suleiman to discuss the missing vehicles from Best Drive's inventory. Brymer explained that Saaid and Suleiman produced photographs of units that Saaid and Suleiman claimed were sold to customers but that the sale proceeds had not yet been remitted to Plaintiff. Brymer indicated that he was satisfied with Saaid's and Suleiman's explanation. Brymer, Saaid, and Suleiman had subsequent meetings regarding Best Drive's record keeping and an audit of Best Drive's financial condition. Thereafter, on May 3, 2018, Brymer determined that Best Drive had fifteen or sixteen units out of compliance (either the vehicle could not be accounted for in Best Drive's inventory or the sale proceeds of a unit had

---

[4] Plaintiff's Exhibit 7 - units 17, 29, 37, 25, 51, 13, and 22. Each deal jacket indicated that a unit was sold, and the back of the title was endorsed before the white slip was sent to Used Cars. This suggests that the transfer of title occurred before sale proceeds were to be remitted to Plaintiff. What should have happened is that certificates of title would have been sent to Best Drive after Used Cars received the sale proceeds. Wolfe stated that this was the case as to all the white jacket files in Plaintiff's Ex. 7.

not been remitted to Used Cars). As such, Used Cars stopped payment under its financing arrangement with Best Drive so that Best Drive would be unable to purchase more cars with funding from Used Cars.

Brymer suspected that Best Drive was out of trust as early as April 2018. Brymer was also aware that several units on Best Drive's lot were in curtailment. "Curtailment" in the auto industry is where the dealer pays down the debt when the unit has been on the lot for more than ninety days. Tammi Henley of Used Cars emailed Suleiman on December 28, 2017, with a list of units in curtailment and a notation that Best Drive was delinquent $4,885.57 in curtailment payments to Used Cars. Def. Ex. C, bates nos. 55 and 56. Nonetheless, Brymer testified that Used Cars had conducted an ACH (Automated Clearing House) of Best Drive's bank account and received payments of approximately $40,000 in May 2018. Defendant ("Def.") Ex. A, bates no. 4. Brymer also stated that Best Drive "tended to make monthly payments on time."

Thereafter, near the end of May 2018, Brymer picked up the remaining units on Best Drive's lots because Brymer determined that Best Drive had sixty-five units out of trust. Roughly twenty-five units were retrieved and were sold at auction, with the proceeds being applied to Best Drive's balance on its promissory note with Used Cars.

Brymer admitted that he sent a letter on June 1, 2018, to all the dealerships that had floor financing with Used Cars announcing the firing of Don Mayer, a former employee of Used Cars, who had been responsible for monitoring Best Drive's business and addressing any issues regarding the sale of inventory and payment to Used Cars, Def. Ex. C, bates p. 54. Brymer explained that Mayer was fired for "not living up to expectations." Brymer acknowledged that Mayer supervised other dealerships that were out of trust, and that the number of dealerships out of trust was less than five percent of the Used Cars' loan portfolio. Brymer agreed that some of

7

the dealerships to which Used Cars provided floor financing were arguably out of trust because Used Cars had not followed internal procedures for dealing with dealerships out of trust.[5]

Wail Suleiman

Suleiman described himself as the "step father-in-law" of Saaid. Suleiman contended that he made none of the business decisions for Best Drive, only Defendant did. At trial, Suleiman contradicted Saaid's testimony at his § 341 meeting of creditors ("§ 341 meeting"), that Suleiman leased Best Drive from Saaid. Suleiman said emphatically that there was no oral or written lease between Suleiman and Saaid for Best Drive. Suleiman asserted that Saaid did not care if Used Cars got paid and that unit sale proceeds were not used to pay for the vehicle that was sold, but rather that the proceeds were applied to the floor plan debt. Suleiman acknowledged meeting with Brymer and Saaid and that he and Saaid produced photos of missing vehicles and made representations that the missing vehicles were in the process of being sold. Suleiman opined that Best Drive never made a profit from its business operations. Suleiman admitted that he and Saaid fought regarding the operation of Best Drive and that there was "bad blood" between them.[6]

Abdelali Saaid

Defendant immigrated to the United States from Morocco in 2005. Saaid was present for Suleiman's testimony and asserts that Sulieman's testimony is incorrect. Further, Saaid stated that he has not operated Best Drive since July 2016 and that Suleiman had access to Best Drive's bank accounts. Saaid could not testify as to whether Best Drive followed Used Cars' policies and

---

[5] *See* Def. Ex. C, bates no. 46 – Explanation of Procedures Retail Dealers – which explains Used Cars' policy regarding floor financing with retail dealers.

[6] Def. Ex. B contains transcribed phone conversations between Saaid and Suleiman that reflect an ongoing argument regarding the operation of Best Drive and who was responsible for its operations. The Court has no way to verify the accuracy or reliability of the transcriptions. There is a vague reference to a rental or lease agreement between Suleiman and Saaid, but there is no indication as to any terms of the lease. The Court cannot make any findings as whether there was a lease between Saaid and Suleiman. The only operative fact that can be deduced regarding the business relationship between Saaid and Suleiman is that Suleiman needed Saaid's dealership license to operate Best Drive (assuming he did) because Suleiman was ineligible to have a dealership license.

procedures because Saaid stated that he did not operate Best Drive. Saaid testified that notwithstanding that he had executed the loan documents with Used Cars in April 2017 and March 2018, that Don Mayer wanted Suleiman operating Best Drive. Further, Saaid stated that he only went to the dealership when Suleiman wanted help. Moreover, Saaid stated that he rented Best Drive to Suleiman for $1,000.00 per month because Suleiman had prior experience in operating a dealership at the same location and at other locations.

Saaid stated that he was unaware that Best Drive was having financial difficulties because Suleiman was monitoring Used Cars' emails to Best Drive. Saaid agreed that there was no written lease with Suleiman and that there was an oral agreement between them based upon a cultural relationship. Saaid stated that Don Mayer agreed to increase Best Drive's line of credit to $650,000 because Best Drive had exceeded its line of credit of $500,000.00. Saaid agreed with Used Cars' contention regarding the number of cars that are out of trust and the amount due. Saaid did not dispute that he signed the 2017 promissory note and renewal for $650,000.00, and that he was the sole owner and director of business for Best Drive.

Based upon the testimony of the witnesses, the Court's review of all admitted exhibits, and the weighing of the credibility of each witness, the Court can make the following findings of fact. Sometime in May of 2018, Used Cars learned that Saaid was selling sixty-five units "out of trust," a phrase commonly used in the automobile sales industry referring to the illegal sale of units that were paid for with a loan and then not remitting funds back to the secured lender. Saaid employed two schemes in the sales of the sixty-five units, without remittance of the proceeds to Used Cars.

Scheme One was discovered when Used Cars did an audit of Best Drive's vehicle deal jackets–envelopes that contain dealership records–and found no white slips, which are the receipts

from the tax office evidencing the application for title and payment of fees and taxes. This scheme involved the sales of twenty-five of the sixty-five units to consumers without copies of the original titles. Saaid, in contradiction to Texas State law and to defraud Used Cars, never requested the original titles from Used Cars who still holds fifteen of the original titles. Saaid transmitted the titles for the other ten vehicles to the DMV when demanded in order to allow the defrauded consumer to get a title to their car.

Scheme Two was discovered when Used Cars did an audit of Best Drive's vehicle deal jackets involving the sale of forty of the sixty-five units and found corresponding white slips and copies of the titles. Used Cars had provided the financing for the forty units and received the corresponding original titles. With these transactions, Saaid had requested the original titles to legally effectuate the transfer of titles, but fraudulently kept the proceeds to their sales without remittance to Used Cars.

At Saaid's § 341 meeting, Saaid declared that he did not in fact run the dealership himself and had a lease agreement Suleiman prior to 2016 to allow Suleiman to use Saaid's dealer's license and operate Best Drive. Saaid further testified that he received payments for the leasing of Best Drive. Saaid claimed he did some work for Best Drive in the capacity of an independent contractor or employee in areas such as accounting, dealing with finance companies, and sales, but was never in a decision making or operational role. Then, in July 2016, he was no longer involved in the day-to-day business at all.

At all times, prior to and up to the time of the § 341 meeting, Saaid never disclosed to Used Cars that he had a lease agreement with Suleiman. Further, prior to and up to the time of the § 341 meeting, Saaid never disclosed to Used Cars that Suleiman, not Saaid, was the operator of Best Drive. Also, prior to and up to the time of the § 341 meeting, there was no reason for Used Cars to

believe that Saaid was not involved in the day to day operations of Best Drive. At all times, prior to and up to the time of the § 341 meeting, Saaid never disclosed to Used Cars that he left Best Drive in July 2016. The testimony of Wolfe and Brymer demonstrate that they did not know of Saaid's purported non-involvement in Best Drive.

There is no probative evidence to show that there was any lease or agreement (written or oral) between Saaid and Suleiman. Saaid and Suleiman provided contradicting testimony as to the existence of a lease. Moreover, the transcription of the phone conversations between Saaid and Suleiman is inconclusive as to whether there was a lease and what the terms of the lease were. Saaid's and Suleiman's testimony regarding the lease is not credible. The existence of a lease agreement from Saaid to Suleiman to operate the business is a ruse to avert the responsibility for what happened to the sale proceeds pertaining to the sixty-five units of Used Cars' collateral.

Saaid's involvement in the Best Drive business is evidenced by his business meetings and communications with Used Cars' employees, his execution of the loan documents, and his signature within at least fifteen of the sixty-five vehicle dealer jackets throughout 2018. The amount owed by Saaid to Used Cars is $450,816.02 plus post judgment interest, costs of court, and reasonable attorney fees to the extent recoverable under applicable law (collectively "amount owed"). The amount owed by Saaid to Used Cars is a debt for money that arises out of Saaid's fraud, namely false representations or actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A). The amount owed by Saaid to Used Cars is also a debt that arises out of a willful and malicious injury caused by Saaid to Used Cars or the property of Used Cars within the meaning of 11 U.S.C. §523(a)(6).

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1334 and this proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I). An individual may not obtain discharge of debts incurred through his own wrongful conduct. *In re Tegeler*, 586 B.R. 598, 635 (Bankr. S.D. Tex. 2018). A debt may not be discharged under Chapter 7 of the Code if the debt is for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A), or if a debtor's conduct is willful and malicious as defined under 11 U.S.C. § 523(a)(6).

**Exception to Discharge Under 11 U.S.C. § 523(a)(2)(A)**

Under § 523(a)(2)(A) of the Bankruptcy Code, debts "for money, property, services, or an extension, renewal, or refinancing of credit" are not dischargeable if the debt was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (West 2018).[7] To succeed in a non-dischargeability action under § 523(a)(2)(A), a creditor must prove (1) that the debtor made a representation; (2) that the debtor knew was false; (3) that the debtor made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied upon; and (5) that the creditor sustained a loss as a "proximate result" of its reliance. *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)). The creditor must prove all five elements by a preponderance of the evidence. *Id*. To succeed on a fraud claim under § 523(a)(2)(A), any misrepresentation must be "knowingly and fraudulently made." *Acosta,* 406 F.3d at 372 (citation omitted). Parties may infer intent to deceive from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Id*. (citation omitted). A debtor's misrepresentation of his intentions may constitute a false representation within the meaning of the

---

[7] Hereinafter, all sections cited are in reference to 11 U.S.C. *et seq* unless otherwise noted.

dischargeability provisions of the Code, if when the representation is made, the debtor has no intention of performing as promised. *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992).

In *Husky Int'l Elec., Inc. v. Ritz,* 136 S.Ct. 1581 (2016), the Supreme Court held that the actual fraud provision of. § 523(a)(2)(A) can be asserted without a false representation and is broad enough to incorporate a fraudulent conveyance. *Id*. at 1590. The Supreme Court's holding on the term "actual fraud" was that the word "actual" denotes "any fraud that involv[es] moral turpitude or intentional wrong." *Id*. at 1586. Therefore, " anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Id*.

Actual reliance is the equivalent of causation-in-fact, which is defined as a "substantial factor in determining the course of conduct that results in . . . loss." *Mercer,* 246 F.3d at 413 (emphasis removed) (citing RESTATEMENT (SECOND) OF TORTS § 537 cmt. a). This level of reliance "requires little of the creditor." *Mercer*, 246 F.3d at 413 (citing *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 284 (11th Cir. 1995)). In the case of credit card fraud, as in *Mercer*, "an issuer usually will be able to establish *actual* reliance by showing it would *not* have approved the loan in the absence of debtor's promise to pay (through card-use)." *Mercer*, 246 F.3d at 411.

Justifiable reliance, described as "an intermediate level of reliance," is a subjective standard that is more relaxed than the objective reasonable reliance standard. *Field v. Mans*, 516 U.S. 59, 74 (1995). This standard does not remove reasonableness from the equation, however, "for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Id*. at 76. Reliance is justifiable, rather, if (1) the promisor intends to perform, and (2) the promisee has reason to believe that the agreement will be carried

13

out. *Mercer*, 246 F.3d at 416 (citing RESTATEMENT (SECOND) OF TORTS § 544). The court must look at both elements from the perspective of the promisee, meaning the first element is not focused on whether the promisor truly *intends* to perform, but whether the promisee is justified in *believing* that the promisor intends to perform. *Id*. The second element focuses whether any obstacle or physical impossibility makes it impossible for the agreement to be carried out. *Id*. If such an obstacle exists, the Court must determine whether the promisee knew of its existence, rendering reliance unjustifiable. *Id*.

There is evidence of Saaid's actual fraud in Scheme One involving the fraudulent sales of twenty-five units to unsuspecting consumers without original titles in contradiction of state law. Without the request for the original titles, Used Cars was kept from the knowledge that Used Cars' collateral was being sold and the sale proceeds diverted by Best Drive. Saaid knew that Used Cars was unaware of the fact that Used Cars sustained a loss as a result of the fraudulent conveyances. Suleiman's testimony provides examples of his asking Saaid to obtain the original titles to provide to the consumers' financers, and that Saaid had no intention to request the original titles and pay off Used Cars.

There is evidence of false representations made in Scheme Two involving the fraudulent sales of forty units. Upon notification of each sale of Used Cars' collateral and request for the release of the corresponding original title, Used Cars transmitted the corresponding original title to Best Drive to effectuate transfer of title to consumers. Prior to the release of specified original titles, Used Cars justifiably relied upon the representation that the money derived from the sale of those identified units would be used to repay Used Cars. Additionally, the documentation of the sales would be maintained in Best Drives' vehicle deal jackets. Instead, Used Cars did not receive the payments, and Saaid has not accounted for thirteen vehicle deal jackets which contain

the documentation of the sales of the thirteen units of Used Cars' collateral. The amount of debt owed to Used Cars derived from the sales of Used Cars' collateral identified in Scheme Two are damages arising from Saaid's fraud.

In sum, all five elements under *Acosta* and § 523(a)(2)(A) are met. Saaid, as the sole owner and president of Best Drive, made representations regarding the sales of units. Saaid knew that the sale proceeds were not remitted to Plaintiff. Saaid deceived Plaintiff by either representing that unit sale proceeds were going to be submitted to Plaintiff or that Saaid did not disclose the sale of units. Plaintiff relied on these representations and did not know that Saaid purportedly did not operate Best Drive since July 2016. Finally, there is not a dispute as to the amount of unit sale proceeds that were not remitted to Plaintiff.

### Exception to Discharge Under § 523(a)(6) Willful and Malicious Injury

Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, that:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

In other words, debts for "willful and malicious injury" are not dischargeable in a Chapter 7 case. 11 U.S.C. § 523(a)(6); *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). Under *Geiger*, the word "willful" modifies the word "injury," meaning a debtor must have intended not only to commit an act resulting in the plaintiff's injury, but to also inflict the injury itself. 523 U.S. at 61. Accordingly, "debts arising from recklessly or negligently inflicted injuries do not fall within the- compass of § 523(a)(6)." *Id.* at 64.

The Fifth Circuit employs a two-part test to determine willful and malicious injury. *Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504 (5th Cir. 2003). An injury is willful and malicious if the plaintiff proves "either an objective substantial certainty

15

of harm or a subjective motive to cause harm." *Id.* at 509 (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)). To establish an objective substantial certainty of harm, the court must "analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009). Courts find a subjective motive to cause harm when a defendant acts "deliberately and intentionally, in knowing disregard of the rights of another." *In re Gharbi*, No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011), *aff'd*, Cause No. A-11-CA-291-LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011). In *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x. 360, 361–62 (5th Cir. 2007), the Fifth Circuit restated the test for willful and malicious injury as involving an inquiry "of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." For an injury to be "willful and malicious," it must satisfy the two-part test and not be sufficiently justified under the circumstances to render it not willful and malicious. *Id*. at 362.

There is evidence that Saaid's actions under Scheme One would cause an objective substantial certainty of harm to Used Cars. When a unit was sold, rather than request the original titles from Used Cars–which would mean remittance of the sales proceeds owed to Used Cars– Saaid employed a scheme to sell the units and retain the proceeds for himself. The consumers to whom Saaid sold the units referred to under this scheme were without the original titles. Used Cars would have never known–since it held the original titles–until it audited Best Drive's dealer vehicle jackets. Clearly, Saaid had no intent to submit proceeds for the sales of those units.

Under the subjective test, Saaid should have known that by employing Scheme Two, where he notified Used Cars of sales and requested the titles, that by not remitting the proceeds thereof

16

would place Used Cars at risk. Saaid was not remitting the proceeds to Used Cars and had no intent to do so. His assertion that he was not involved in the operations of Best Drive fails due to the ample evidence of his involvement in sales of the units as identified under Scheme Two.

In all instances regarding the sixty-five units at issue, Saaid received funds to purchase the units. In all instances, Saaid failed to remit the proceeds of the sales of those units to Used Cars as required under the loan documents. "When a borrower intentionally and unjustifiably withholds proceeds from a secured lender, that violation is willful and malicious." *See Ford Motor Credit Co., LLC v. Franceschini (In re Franceschini)*, No. 10-30550, 2012 WL 113337 (Bankr. S.D. Tex. Jan. 12, 2012); *see also Theroux v. HSA Mortg. Co. (In re Theroux)*, No. 94-50530, 1995 WL 103342, at *4 (5th Cir. Feb. 27, 1995) (finding that a mobile home dealer acted willfully and maliciously in withholding proceeds from secured lender when there was no evidence that he had an objectively reasonable belief that the money was not owed to the secured lender). Saaid's conduct was willful and malicious under both the objective and subjective tests. As such, pursuant to § 523(a)(6), Saaid "maliciously injured" Used Cars.

Saaid asserted the affirmative defenses of estoppel, waiver, and failure to mitigate damages. Saaid claims that Plaintiff was aware of Best Drive's financial difficulties and through Don Mayer was complicit in Best Drive's selling units out of trust. Further, when Mayer sought an increase of Best Drive's line of credit to $650,000 because Best Drive had exceeded its floor financing line of credit, Used Cars should have placed more control over its line of credit or possibly should not have increased the amount of its line of credit with Best Drive. Also, Saaid argues that Used Cars is estopped from asserting damages because Brymer acknowledged that sometimes Used Cars did not follow its own internal procedures regarding its financing relationship with its dealers.

Don Mayer was not made available for testimony and the evidence is that he was fired for "not living up to expectations." More importantly, Brymer as president of Used Cars and Wolfe as vice president, bookkeeper, and recordkeeper, had no knowledge regarding Best Drive's failures to remit unit sale proceeds or requests for certificates of title to Used Cars. The Court finds Wolfe's and Brymer's testimony credible as to their lack of knowledge concerning Best Drive's failures. The Court also finds that Wolfe and Brymer were not complicit in Schemes 1 and 2. Moreover, there is no evidence that Wolfe and Brymer knew about the purported lease between Saaid and Suleiman or that Suleiman was operating Best Drive. Based on the evidence provided and the Court's conclusions regarding the nondischargeability of debt under §§ 523(a)(2)(A) and (a)(6), the Court finds Defendant's affirmative defenses unavailing and denied.

## **CONCLUSION**

In summary, Saaid intentionally devised two schemes: 1) Saaid intentionally sold units without original titles; and 2) Saaid requested titles from Used Cars to effectuate sales and intentionally failed to remit the proceeds from such sales. Saaid's assertion of a lease agreement with Suleiman does not shield him from the debt owed to Used Cars.

Accordingly, Used Cars is entitled to a declaration that Saaid's debt to Used Cars is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), and judgment against Saaid for $450,816.02 plus post-judgment interest is GRANTED. Plaintiff may under Fed. R. Civ. P. 54, Fed. R. Bankr. P. 7054 and Local Rule 7054 file its application for attorney's fees and costs to the extent permissible under law. All other relief is DENIED.

A separate final judgment will be entered in conformity with this Memorandum Opinion.

# # #